UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VICTOR T. THOMAS,

      Plaintiff,

      v.                                      Case No. 23-cv-1524-bhl

SYED MOHIUDDIN,
VALERIA PAREDES,
SSM HEALTH WAUPUN MEMORIAL HOSPITAL, and
WISCONSIN INJURED PATIENTS AND
FAMILY COMPENSATION FUND,

      Defendants.

---

## SCREENING ORDER

---

Plaintiff Victor T. Thomas, who is currently serving a state prison sentence at Fox Lake Correctional Institution and representing himself, filed a complaint under 42 U.S.C. §1983, alleging that his civil rights were violated. This matter comes before the Court on Thomas' motion for leave to proceed without prepaying the full filing fee and to screen the complaint.

### MOTION TO PROCEED WITHOUT PREPAYING THE FILING FEE

Thomas has requested leave to proceed without prepaying the full filing fee (*in forma pauperis*). A prisoner plaintiff proceeding *in forma pauperis* is required to pay the full amount of the $350.00 filing fee over time. *See* 28 U.S.C. §1915(b)(1). As required under 28 U.S.C. §1915(a)(2), Thomas has filed a certified copy of his prison trust account statement for the six-month period immediately preceding the filing of his complaint and paid an initial partial filing fee of $81.00; Thomas later made an additional $200 payment. Thomas' motion for leave to proceed without prepaying the filing fee will be granted.

## SCREENING OF THE COMPLAINT

The Court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity and must dismiss any complaint or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, a plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

2

alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555 (internal quotations omitted).

### ALLEGATIONS OF THE COMPLAINT

Thomas asserts that he had a "clival/clivus tumor" for which he received regular treatment at UW-Health Hospital & Clinics. On April 13, 2023, Dr. Ian Koszewski (not a Defendant) performed a biopsy surgery that involved inserting medical instruments into Thomas' nasal passages. A little more than a week later, on April 24, 2023, Thomas began "bleeding profusely" and was transported by ambulance to Waupun Memorial Hospital. Defendant Dr. Syed Mohiuddin was informed of the recent biopsy. Thomas was taken for a CT scan of his head, after which Dr. Mohiuddin allegedly told Thomas there was no bleeding on or inside his brain. Thomas alleges that Dr. Mohiuddin provided the following diagnosis: "Bleeding from the nose; S/P brain surgery; and acute anterior epistaxis." Dr. Mohiuddin used saline nasal spray to loosen the clotting in Thomas' nose and to clear his nasal cavities. There was no active bleeding at that time. Dr. Mohiuddin put gauze in Thomas' nostrils and used a drug that promotes clotting. Defendant Nurse Valeria Paredes cleaned the dried blood from Thomas' face and body. Thomas asserts that he was advised to follow up with an ear, nose, and throat doctor in two days and then discharged.

According to Thomas, as he was being escorted back to Fox Lake, he once again started bleeding profusely. Prison officials directed that Thomas be taken back to the emergency room. Thomas' blood pressure was taken and read 185/111, a significant jump from the reading taken just before his discharge. Thomas was again treated by Dr. Mohiuddin and Nurse Paredes. Dr. Mohiuddin told Thomas that he would "pack" Thomas' right nostril with an epistaxis balloon (rhino rocket) after numbing the nostril with lidocaine. According to Thomas, Dr. Mohiuddin never discussed the risks associated with this proposed treatment. Thomas asserts that, had he

known of the risks, he would have refused the treatment unless other measures were also taken. Dr. Mohiuddin and Nurse Paredes again used saline spray to loosen the blood clotting in Thomas' nose and had him repeatedly blow his nose to clear the nostrils. Dr. Mohiuddin then sprayed Thomas' nostril with lidocaine and then inserted the rhino rocket into his right nostril, causing Thomas "intense pain." Thomas asserts that the lidocaine was insufficient to help him deal with the pain. After inserting the device, Thomas alleges Dr. Mohiuddin told him to "come back if the bleeding starts again." Thomas was then given water and an antibiotic to prevent infection.

After Dr. Mohiuddin exited the room, Nurse Paredes helped Thomas clean the blood off of him and then left to get some paperwork. While she was gone, Thomas once again began to bleed profusely with blood coming out of both nostrils. When Nurse Paredes returned and was informed that Thomas was again bleeding, she gave him "a look of sympathy, shrug[ged] her shoulders and [said] 'I'm sorry.'" Nurse Paredes then offered more gauze and other supplies to help Thomas on the return trip to the institution, which he and the prison staff declined.

Once discharged, Thomas allegedly continued to bleed. Thomas asserts that the officers returned to the institution to consult with the on-call nurse. At 2:00 a.m. Thomas was placed in a sick cell with a hospital bed, where he was given a bag, towels, and water. According to Thomas, he used the towels to catch the blood, but even so, blood was on the floor, bed, and sink.

Thomas explains that Dr. Godiwalla (not a Defendant) arrived in his cell at about 5:30 a.m. and noted that Dr. Mohiuddin should have transferred him to UW-Health in Madison right away. Dr. Godiwalla allegedly provided Thomas with something to bring his blood pressure down. She also reviewed the CT scan and ordered that Thomas be transported to the emergency room at UW-Health, noting that he was still bleeding moderately with blood around the outside of the rhino rocket. Officers transported Thomas to UW-Health, where Dr. Koszewski, who had performed

the biopsy, instructed staff to pack Thomas with a "pope pack" and admit him for observation overnight. Medical staff allegedly removed the rhino rocket, cleaned the nasal passages, and inserted the pope pack. Thomas explains that the ENT team monitored him until he was discharged the next day, with a follow-up appointment set for four days later, on May 1, 2023. Thomas asserts that he was prescribed pain medication, antibiotics, and a saline nose spray.

## THE COURT'S ANALYSIS

At the outset, the Court acknowledges that it is uncertain if Dr. Mohiuddin and Nurse Paredes are state actors that can be sued under §1983. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (§1983 provides a private right of action against persons acting under color of state law who violate an individual's constitutional rights). "Whether a medical provider is a state actor is a functional inquiry, focusing on the relationship between the state, the medical provider, and the prisoner." *Id.* at 797 (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 718 (7th Cir. 2009)). "[M]edical providers who have 'only an incidental or transitory relationship' with the penal system are not considered state actors. *Id.* at 798 (citations omitted). For example, the Seventh Circuit has explained that "an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons. . . . The fact that it does not, and cannot, discriminate against incarcerated individuals does not mean that it has agreed to step into the shoes of the state and assume the state's responsibility toward these persons. It has not." *Rodriguez*, 577 F.3d at 827. Along those lines, the Seventh Circuit has also held that two doctors to whom a prisoner-plaintiff was referred for a one-time examination at which the doctors recommended physical therapy did not have a sufficiently direct relationship with the prisoner for the Court to find that they were

5

acting under color of state law. *See Shields*, 746 F.3d at 798. The appellate court explained that there was no evidence that the doctors had contact with the prison, "that their practice focused on treating inmates, or even that they regularly treated inmates as part of their practices." *Id.* The appellate court therefore concluded that "[t]he undisputed facts [did] not allow a reasonable inference that these doctors acted under color of state law when they took the referral." *Id.*

Of course, without the benefit of discovery, Thomas cannot know whether Dr. Mohiuddin and Nurse Paredes were acting under color of state law. Accordingly, the Court will assume, for purposes of screening only, that they were state actors when they treated Thomas.

With regard to Thomas' allegations that Dr. Mohiuddin and Nurse Paredes' conduct violated the Eighth Amendment, the Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)). At this stage, Thomas' allegations that he experienced uncontrolled bleeding through his nose after biopsy surgery, despite repeated efforts to quell the bleeding, leading to elevated blood pressure readings are sufficient to infer that he may have suffered from an objectively serious medical condition.

Whether Thomas has sufficiently alleged that Dr. Mohiuddin and Nurse Paredes were deliberately indifferent to Thomas' condition is a much closer call. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Thomas painstakingly details the treatment he received, including a CT scan, medications, blood work, physical examinations, and the insertion of a rhino rocket. Such extensive treatment strongly cuts against the suggestion that Dr. Mohiuddin and Nurse Paredes

had "something approaching total unconcern for [his] welfare . . . ." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022). Moreover, although their efforts were unsuccessful, the Seventh Circuit has repeatedly emphasized that "the mere failure of [a provider] to choose the best course of action does not amount to a constitutional violation." *Id.* (quoting *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)).

Still, Thomas alleges that, despite their initial efforts, Dr. Mohiuddin and Nurse Paredes essentially gave up and discharged him without resolving his nosebleed or addressing his high blood pressure. He further explains that, after being discharged, he continued to bleed so much that he believed he was going to die. Given the seriousness of Thomas' condition and the ineffectiveness of Dr. Mohiuddin's treatment and Nurse Paredes' failure to address Thomas' continued bleeding at the time he was discharged, further development of the record is necessary to determine whether they responded reasonably to the risk Thomas faced. Accordingly, Thomas may proceed on Eighth Amendment claims against Dr. Mohiuddin and Nurse Paredes. Thomas may also proceed on state law medical malpractice and/or negligence claims against them. *See* 28 U.S.C. §1367.

Thomas also alleges that Waupun Memorial Hospital violated EMTALA when he was twice discharged before he was stabilized. "EMTALA is not a malpractice statute and so cannot be used to challenge the quality of medical care." *Martindale v. Indiana Univ. Health Bloomington, Inc.*, 39 F.4th 416, 419 (7th Cir. 2022) (citations and internal punctuation omitted). Instead, the Act imposes two limited obligations on hospitals. First, a hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." *Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 893 (7th Cir. 2003) (quoting 42 U.S.C. §1395dd(a)). Second, "[i]f the hospital determines the

7

individual has an emergency medical condition, then the hospital must either 'stabilize' the medical condition or must arrange for the transfer of the individual to another medical facility." *Id.* (quoting §1935dd(b)(1)).

Thomas does not assert that the hospital failed to provide appropriate medical screening examinations. He notes that his vitals were taken, blood was drawn for testing, and a CT scan was performed. Dr. Mohiuddin ruled out a brain bleed and appears to have concluded that the bleeding was coming from the incision in Thomas' nasal passage, which was made when Dr. Koszewski biopsied a tumor nearly two weeks earlier. Thomas asserts that the testing determined he had an emergency condition. Further development of the record is again necessary to confirm Thomas' assertion. But, at this stage and drawing all reasonable inferences in Thomas' favor, the fact that Thomas continued to bleed "profusely" for many hours is sufficient for the Court to infer that he was suffering from an emergency medical condition, which was confirmed by the hospital's testing.

Accordingly, EMTALA then required the hospital to either "stabilize" the condition or arrange for the transfer of the individual to another medical facility. Thomas asserts that his condition was not stabilized prior to his two discharges. While he acknowledges that Dr. Mohiuddin's efforts temporarily stopped the bleeding prior to Thomas' first discharge, Thomas asserts that he started to bleed again shortly after leaving the hospital and that the bleeding was so bad that officers took him back to the emergency room. According to Thomas, he was still bleeding heavily and had elevated blood pressure when he was discharged the second time.[1]

---

[1] Thomas was discharged into the care of medical staff at his institution. He was also instructed to follow-up with his ENT doctor within two days and to consult with his doctor about his elevated blood pressure.

8

The Court acknowledges that under EMTALA "stabilized" does not mean the hospital must cure the condition. *See Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993). It means only that the hospital must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual . . . ." §1395dd(e)(3)(a). Thomas alleges that his nose continued to bleed and needed to be further addressed. It is thus not clear whether the hospital stabilized his condition. When Dr. Godiwalla arrived several hours later, at 5:30 a.m., she opted to transfer Thomas to UW-Health, which is about an hour away from Fox Lake Correctional, so he could be examined by the doctor who had performed the biopsy. Notably, officers transported Thomas in a transport vehicle; Thomas was not transported by ambulance, suggesting his condition was somewhat stable. Nevertheless, development of the record is necessary before it can be determined whether Thomas was "stabilized" prior to being discharged, as that term is defined in EMTALA. Accordingly, the Court will allow Thomas to proceed on an EMTALA claim against Waupun Memorial Hospital.[2]

Thomas may also proceed on a claim that Waupun Memorial Hospital is responsible for Dr. Mohiuddin and Nurse Paredes' actions under a theory of respondeat superior. But Thomas fails to state a claim against Waupun Memorial Hospital under Wis. Stat. §256.30(5), which requires "[e]ach hospital providing emergency services [to] create a plan for referrals of emergency patients when the hospital cannot provide treatment for such patients." While the statute provides

---

[2] Per §1395dd(d)(2), individuals who have suffered harm as a direct result of a violation may sue "the participating hospital," not the responsible physicians. *See Williams v. County of Cook*, No. 97-C-1069, 1997 WL 428534 at *4 (N.D. Ill. July 24, 1997) (*citing Baber v. Hospital Corp. of America*, 977 F.2d 872, 877 (4th Cir. 1992) ("Although the statute clearly allows a patient to bring a civil suit for damages for an EMTALA violation against a participating hospital, . . . no section permits an individual to bring a similar action against a treating physician.")).

9

for the imposition of fines for established offenses, nothing in the statute empowers individuals to sue hospitals for damages.

Finally, the Court notes that a plaintiff may recover damages from the Wisconsin Injured Patients and Families Compensation Fund in the event the plaintiff is successful on a state law medical negligence claim against an individual Defendant. *See Reifschneider v. Grossman*, No. 18-C-146, 2019 WL 1522065 (E.D. Wis. Apr. 8, 2019) (citing Wis. Stat. §655.27)). Given that Thomas is proceeding on malpractice/negligence claims against Dr. Mohiuddin and Nurse Paredes, the Court will allow the Fund to remain in this case.

**IT IS THEREFORE ORDERED** that Thomas' motion for leave to proceed *in forma pauperis* (Dkt. No. 3) is **GRANTED**.

**IT IS FURTHER ORDERED** that the United States Marshal shall serve a copy of the complaint and this order upon Dr. Syed Mohiuddin, Valeria Paredes, Waupun Memorial Hospital, and the Wisconsin Injured Patients and Families Compensation Fund pursuant to Federal Rule of Civil Procedure 4. Thomas is advised that Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2)–(3). Although Congress requires the Court to order service by the U.S. Marshals Service precisely because *in forma pauperis* plaintiffs are indigent, it has not made any provision for these fees to be waived either by the Court or by the U.S. Marshals Service. The Court is not involved in the collection of the fee.

**IT IS FURTHER ORDERED** that Dr. Mohiuddin, Nurse Paredes, Waupun Memorial Hospital, and the Wisconsin Injured Patients and Families Compensation Fund shall file a responsive pleading to the complaint.

**IT IS FURTHER ORDERED** that copies of this order be sent to the officer in charge of the agency where Thomas is located.

**IT IS FURTHER ORDERED** that the agency having custody of Thomas shall collect from his institution trust account the $69.00 balance of the filing fee by collecting monthly payments from Thomas' prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action. If Thomas is transferred to another institution, the transferring institution shall forward a copy of this Order along with Thomas' remaining balance to the receiving institution.

**IT IS FURTHER ORDERED** that Thomas' motion that the Court enter a collection order pursuant to 28 U.S.C. §1915(b) (Dkt. No. 10) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the parties may not begin discovery until after the Court enters a scheduling order setting deadlines for discovery and dispositive motions.

**IT IS FURTHER ORDERED** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the Court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse

517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter.

Thomas is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Enclosed is a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that Thomas may find useful in prosecuting this case.

Dated at Milwaukee, Wisconsin on February 21, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge