UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VICTOR T. THOMAS,

        Plaintiff,

      v.                                                                  Case No. 23-cv-1524-bhl

SYED MOHIUDDIN et al.,

        Defendants.

---

## DECISION AND ORDER

---

      Plaintiff Victor T. Thomas, an inmate at the Fox Lake Correctional Institution, is representing himself in this 42 U.S.C. §1983 action and proceeding on claims related to medical treatment he received over the course of several hours in the emergency room at the Waupun Memorial Hospital. Defendants Dr. Syed Mohiuddin, Nurse Valeria Paredes, and SSM Health Waupun Memorial Hospital (the Medical Defendants) and Defendant Wisconsin Injured Patients and Families Compensation Fund (the Fund) have moved for summary judgment. Dkt. Nos. 100, 107. For the reasons explained below, the Court will grant the Medical Defendants' motion, deny as moot the Fund's motion, and dismiss the case.

## BACKGROUND

      At the relevant time, Thomas was a convicted prisoner in the custody of the Wisconsin Department of Corrections. Dr. Mohiuddin worked as an attending physician in the Emergency Department of the Waupun Memorial Hospital, where Nurse Paredes worked as a registered nurse. On April 24, 2023, Dr. Mohiuddin was working an overnight shift as the attending ER doctor. Shortly before 10 p.m., Thomas arrived at the Emergency Department complaining of epistaxis, which is commonly known as a bloody nose. Nurse Sarah Guinn, who is not a Defendant, was

assigned as Thomas' nurse. In her triage notes, she wrote that Thomas' nose had been bleeding for about 20 minutes prior to his arrival. She also stated that he had "a history of pliable nasal tumor removal two weeks ago performed at UW Hospital in Madison." As part of assessing Thomas, Dr. Mohiuddin ordered a CT of Thomas' head and physically examined and interviewed him. Thomas explained that his nose had begun to bleed about an hour before arriving at the Emergency Department, although he noted that the bleeding had stopped by the time he arrived. Dr. Mohiuddin confirmed that there was no active bleeding. Dkt. Nos. 105, 125 at ¶¶4-8, 19-32.

Dr. Mohiuddin explains that, while he believed that the bleeding was coming from the area of the biopsy incision, the CT did not reveal any evidence of active brain bleed or any other medical condition that would require emergency neurological stabilization or treatment or a referral for emergency neurological treatment. Dr. Mohiuddin further explains that, because Thomas was not exhibiting any active bleeding in the Emergency Department, he concluded that Thomas did not have an emergency medical condition that would require stabilization. Dr. Mohiuddin also had labs drawn, none of which returned results that were concerning to him for any emergency condition. In particular, Thomas' hemoglobin and hematocrit numbers were within the normal range, allowing Dr. Mohiuddin to conclude that Thomas had not experienced any clinically concerning blood loss and that he was not at risk of a serious health complication from blood loss. Dkt. Nos. 105, 125 at ¶¶27, 33, 57-59; Dkt. No. 131 at ¶24.

Nonetheless, because Thomas had reported bleeding before he arrived at the Emergency Department, Dr. Mohiuddin considered potential treatment options. According to Dr. Mohiuddin, he had a limited number of treatments to address a nosebleed. His first choice was the application of tranexamic acid (TXA), an antifibrinolytic agent commonly used to stop initial bleeding and to prevent/reduce the frequency and/or severity of rebleeding. TXA can be administered orally,

2

intravenously, or applied topically. Dr. Mohiuddin explains that TXA is his preferred treatment in the absence of active bleeding because it is essentially painless in application and poses no health risks beyond the possibility that rebleeding may recur. Dkt. Nos. 105, 125 at ¶¶34-41.

In addition to TXA, Dr. Mohiuddin's next treatment option was nasal packing, either with Merocel sponges or a Rhino Rocket. The sponges are inserted into the nasal passage and then expanded by adding water, effectively blocking the nasal passage to stifle active bleeding and promote clot formation. A Rhino Rocket is inserted into a patient's nasal passage and then inflated with air, thereby exerting gentle but firm mucosal compression. Dr. Mohiuddin explains that the primary risk involved with these nasal packing options is that they are invasive and can be uncomfortable. For this reason, nasal packing is not Dr. Mohiuddin's first choice of treatment if there is no active bleeding.

Dr. Mohiuddin explains that the only other treatment option available to him in the Emergency Department beyond TXA and nasal packing would be referral to a higher level of care. Dr. Mohiuddin asserts that he considered referral a last resort to be implemented only if there was active bleeding that could not be stabilized. Dkt. Nos. 105, 125 at ¶¶42-49.

Because Thomas' nose was no longer actively bleeding, Dr. Mohiuddin offered treatment with TXA. Dr. Mohiuddin explains that he believed the TXA would augment the natural blood clotting that had already occurred in Thomas' nose. Thomas consented to "medicine being sprayed into [his] nose in order to stop the bleeding." Dr. Mohiuddin explains that the only risk was that the TXA would not be effective and that the bleeding could restart. Thomas explains that Dr. Mohiuddin instructed him to blow his nose hard several times to clear out the blood clots. He then stuffed Thomas' nose with cotton balls, sprayed the cotton balls with TXA for a few minutes, and then removed the cotton balls. Dkt. Nos. 105, 125 at ¶¶50-56; Dkt. No. 131 at ¶¶26, 29, 31, 34.

3

Dr. Mohiuddin noted that Thomas' blood pressure was elevated from normal levels. But he concluded that the elevation was not to the point that it constituted an acute health risk. Dr. Mohiuddin explains that high blood pressure is a chronic health condition that is not typically treated acutely in the Emergency Department. Instead, it is typically treated by a patient's primary care provider over the long term, typically through medication and diet. Dr. Mohiuddin asserts that Thomas' blood pressure did not constitute an emergency medical condition and did not present any clinical concerns requiring emergency treatment in the Emergency Department. Dkt. Nos. 105, 125 at ¶¶60-64.

After administering the TXA, Dr. Mohiuddin determined that Thomas was stable because there was no evidence that he was actively bleeding. He then ordered Thomas' discharge with instructions that he should return to the Emergency Department should the bleeding restart and that he should follow up with his treating ENT within two days. Thomas was discharged from the hospital at 11:29 p.m., less than two hours after he was admitted. Dkt. Nos. 105, 125 at ¶¶64-65.

Thomas explains that a few minutes after being discharged, his nose began to bleed again. He reported this to the correctional sergeant, who pulled over on the side of the road and, after calling his supervisors, was instructed to take Thomas back to the Emergency Department. Thomas returned to the Emergency Department at 11:55 p.m., about fifteen minutes after being discharged. Within ten minutes, Dr. Mohiuddin personally examined him. He noted dried blood in both nostrils, with clotting evident in the right nostril. He also noted active bleeding on the right side, both anteriorly and posteriorly. Given the presence of active bleeding, Dr. Mohiuddin elected to proceed to the next treatment step: nasal packing. Dkt. Nos. 105, 125 at ¶¶66-71; Dkt. No. 131 at ¶¶40-41.

Dr. Mohiuddin explains that he did not think the sponges would be effective, so given Thomas' nose anatomy and the source of the bleeding, he decided the larger size of the Rhino Rocket was the best option. Thomas consented to the use of the Rhino Rocket, although he asserts that he expressed doubt that nasal packing on only one side would stop the bleeding. At about 12:26 a.m., after informing Thomas that nasal packing can be "uncomfortable," Dr. Mohiuddin applied 2% lidocaine jelly to Thomas' nose as a numbing agent. Dr. Mohiuddin explains that he then inserted the Rhino Rocket and partially inflated it to the point where he believed it would effectively stop the blood flow to allow natural clotting to occur. Dr. Mohiuddin did not fully inflate the Rhino Rocket because he did not want to cause Thomas unnecessary pain. Thomas asserts that the insertion of the Rhino Rocket was very painful and that he does not believe Dr. Mohiuddin inflated it at all. He also states that he later developed a pressure headache. Dkt. Nos. 105, 125 at ¶¶72-83; Dkt. No. 131 at ¶¶47-54.

After inserting the Rhino Rocket, Dr. Mohiuddin confirmed the absence of active bleeding and noted only some minimal oozing on the right side. He explains that this was normal and expected following the insertion of the Rhino Rocket. Although Thomas' blood pressure remained slightly elevated, he continued to believe that no emergent treatment was required for that condition. Because there was no active bleeding after he inserted the Rhino Rocket, Dr. Mohiuddin concluded that Thomas' condition was stabilized and that he could be discharged. Dr. Mohiuddin prescribed an antibiotic and advised in the discharge instructions that Thomas should return to the Emergency Department if the bleeding restarted. He further instructed the prison health officials to inform Thomas' treating neurosurgeon about the nosebleed. Dkt. Nos. 105, 125 at ¶¶83-91.

According to Thomas, after the Rhino Rocket was inserted, he informed Nurse Paredes that he was in pain, but no further pain relief was offered to him. He asserts that Dr. Mohiuddin

5

left the examination room a few minutes after inserting the Rhino Rocket and did not return. Thomas asserts that he began to bleed again and from both nostrils after Nurse Paredes left the room to get the discharge paperwork. According to Thomas, when Nurse Paredes returned to the room, a corrections sergeant informed her that Thomas was still bleeding. Nurse Paredes explains that she does not remember observing Thomas bleeding after the insertion of the Rhino Rocket nor does she remember any corrections staff informing her that Thomas was bleeding. She explains that had she observed bleeding or been informed of bleeding she would have noted the bleeding in Thomas' ER chart and would have informed Dr. Mohiuddin. There is no mention of any bleeding or complaints of bleeding in Thomas' chart, and there is no evidence that Dr. Mohiuddin was ever informed by anyone that Thomas had started bleeding again. Because Dr. Mohiuddin did not observe any active bleeding and because the labs and CT were unconcerning, Dr. Mohiuddin believed Thomas' condition was stable and that he could be discharged. Dkt. Nos. 105, 125 at ¶95, 135-140; Dkt. No. 131 at ¶¶57-72.

Nurse Paredes confirms that the discharge paperwork given to corrections personnel instructed them to return Thomas to the Emergency Department if his nose started to bleed again. Thomas was discharged at 12:57 a.m., about thirty minutes after the insertion of the Rhino Rocket. Thomas did not return to the Emergency Department after he was discharged for the second time. Dkt. Nos. 105, 125 at ¶¶92-94, 141-142.

Thomas asserts that his nose continued to bleed from both nostrils on and off through the night after he was discharged. He also states that the headache and pain from the Rhino Rocket increased through the night. In the morning, the doctor at the prison instructed corrections staff to transport Thomas to the UW-Hospital where his ENT and neurosurgeon were on staff. Emergency Department staff at that institution further inflated the Rhino Rocket and gave Thomas

acetaminophen for his complaints of pain. After consulting with the ENT, the Rhino Rocket was removed, a blood clot was suctioned from Thomas' nose, and his nostril was packed with a pope pack. Thomas was admitted for observation overnight and provided with narcotic and over-the-counter pain relief. Dkt. No. 105, 125 at ¶¶148-49; Dkt. No. 131 at ¶¶77-80.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

# ANALYSIS

**1. No reasonable jury could conclude that Waupun Memorial Hospital violated the EMTALA when Dr. Mohiuddin discharged Thomas from the Emergency Department.**

Thomas asserts that Waupun Memorial Hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA) when he was discharged from the Emergency Department before his emergency medical condition was stabilized. The EMTALA imposes two primary obligations on federally funded hospitals. First, when a person seeks treatment from an emergency room, the hospital must provide a screening examination to determine whether an "emergency medical condition" exists. *Thomas v. Christ Hosp. and Med. Cent.*, 328 F.3d 890, 893 (7th Cir. 2003) (citing 42 U.S.C. §1395dd). Second, if the hospital determines that the person has an emergency medical condition, the hospital must either "stabilize" the medical condition or must arrange for the person to be transferred to another medical facility. *Id.* "An '[e]mergency medical condition' means a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical attention could reasonably result in 'imminent danger of death or serious disability.'" *Id.* (citing §1395dd(e)(1)). "The EMTALA defines 'stabilized' as a state in which no material deterioration of the condition is likely, within reasonable medical probability, to result." *Id.* (citing §1395dd(3)(3)(B)).

Importantly, courts have frequently observed that the "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute." *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996). As the Fourth Circuit explained, "[i]t's core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical practice law affords no claim for failure to treat. Numerous cases and the Act's legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical

8

reasons." *Id.* (citations omitted). The appellate court further explained that "[o]nce EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, that patient's care becomes the legal responsibility of the hospital and the treating physicians. And the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt." *Id.*; *see also Curry v. Advocate Bethany Hosp.*, No. 05-3967, 204 F. App'x 553, 556 (7th Cir. 2006) ("Thus, the hospital screened Deborah and stabilized her in accordance with EMTALA. That the treatment provided was ineffective—that it may even have involved a misdiagnosis or malpractice—does not violate EMTALA so long as she was stabilized. EMTALA is not a federal malpractice statute." (citations omitted)). Thomas has not presented evidence from which a jury could reasonably conclude that the EMTALA was violated either time he was discharged from the Emergency Department.

As to the first visit on April 24, 2023, the parties agree that Thomas' nose had stopped bleeding by the time he arrived at the Emergency Department. Still, given Thomas' recent nasal tumor biopsy, Dr. Mohiuddin examined and interviewed Thomas about his complaints and ordered a CT scan and labs. After reviewing the results, Dr. Mohiuddin concluded that Thomas was not suffering from an "emergency medical condition." Thomas had no active bleeding, the CT revealed no evidence of an active brain bleed or any other condition requiring emergency neurological treatment, and the labs showed no clinically concerning blood loss. Further, although Thomas' blood pressure levels were elevated, Dr. Mohiuddin explains that elevated blood pressure is a chronic condition, not an emergency condition requiring immediate treatment.

Thomas presents no evidence to rebut Dr. Mohiuddin's conclusions. He suggests that, given his recent biopsy, his nosebleed *could have* suggested an emergency medical condition that

9

*could have* been impacted by his elevated blood pressure. But Thomas is not competent to offer medical opinions on whether he *did* present with an emergency medical condition, and Dr. Mohiuddin relied on both his own medical training and the results from various tests to conclude Thomas did *not* present with such a condition. Because Dr. Mohiuddin's screening revealed no emergency medical condition during Thomas' first visit, the requirements of the EMTALA were satisfied. *See Martindale v. Univ. Health Bloomington, Inc.*, 39 F.4th 416, 419 (7th Cir. 2022) (explaining that if the screening does not turn up an emergency medical condition, "the hospital's obligations under the Treatment Act come to an end").

With regard to Thomas' second visit—just fifteen minutes after his first visit—Thomas presents no evidence from which a jury could reasonably conclude that he was not "stabilized" at the time he was discharged. Dr. Mohiuddin had concluded less than an hour earlier that, although Thomas had recently undergone a nasal tumor biopsy, his nosebleed did not require emergency neurological treatment. Dr. Mohiuddin therefore pursued treatment options to stabilize Thomas' condition by controlling the active bleeding until Thomas could consult with his ENT and/or neurologist, which Dr. Mohiuddin recommended he do within two days. The following facts are undisputed: (1) Thomas' nose had stopped actively bleeding immediately after Dr. Mohiuddin inserted the Rhino Rocket; (2) Dr. Mohiuddin remained in the room for two to three minutes after he inserted the Rhino Rocket, and during that time Thomas' nose was not actively bleeding; (3) Thomas' nose was not actively bleeding when Dr. Mohiuddin left the room, nor was it actively bleeding when Nurse Paredes cleaned the dried blood off of Thomas and eventually left the room to print the discharge paperwork; (4) Dr. Mohiuddin instructed corrections staff in the discharge paperwork to readmit Thomas to the Emergency Department should his nose start to bleed again; (5) At no point after Dr. Mohiuddin ordered Thomas to be discharged did anyone inform Dr.

Mohiuddin that Thomas' nose had started to actively bleed again; and (6) Corrections staff chose to leave the Emergency Department after Thomas was discharged. *See* Dkt. No. 123 at ¶¶102-33.

Thomas' assertion that he was discharged even though his condition had not been stabilized mischaracterizes the sequence of events. The undisputed facts show that at the time Dr. Mohiuddin discharged Thomas, Thomas' nose was not actively bleeding. And contrary to Thomas' suggestion, the fact that the Rhino Rocket *later* proved to be ineffective does not mean that Thomas' condition was not stabilized at the time Dr Mohiuddin discharged him. Under the EMTALA, 'stabilized' is defined as a state in which "no material deterioration of the condition is likely, within reasonable medical probability, to result . . . ." §1395dd(e)(3)(B). Dr. Mohiuddin explains that nasal packing is often successful in stopping a nosebleed, and based on the information available to him, he believed that the insertion of the Rhino Rocket had been successful. He also believed that no further deterioration of Thomas' condition was likely before Thomas would have the opportunity to consult with his ENT and neurologist consistent with the instructions in the discharge paperwork.[1]

---

[1] Indeed, Thomas has also not presented evidence that a "material deterioration of the condition" occurred after he left the hospital. Thomas alleges only that his nose bled on and off for the few remaining hours of the night and that early the next morning he was transported by prison van (not ambulance) to the UW-Hospital so he could consult with his ENT as recommended by Dr. Mohiuddin. After Thomas was evaluated, he did not receive emergency treatment; instead, medical staff further inflated the Rhino Rocket that Dr. Mohiuddin had inserted. When the bleeding continued and Thomas complained of pain, a different type of nasal packing was tried, which proved successful. Thomas did not receive a blood transfusion for blood loss and no surgery was necessary. It therefore appears that Thomas' condition, while not resolved, remained stable without "material deterioration" after Dr. Mohiuddin discharged him. *See Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993) ("EMTALA requires only that a hospital stabilize an individual's emergency condition; it does not require a hospital to cure the condition."). It also appears that at no point was Thomas suffering "acute symptoms of sufficient severity that the absence of immediate medical attention could reasonably result in 'imminent danger of death or serious disability.'" Thomas presents no evidence to support a conclusion that an intermittent nosebleed for less than ten hours could reasonably result in a person being in "imminent danger of death or serious disability."

Thomas makes much of the fact that his nose started bleeding before he left the hospital (but after Dr. Mohiuddin discharged him).[2] Even if this is true, however, the record confirms that Dr. Mohiuddin instructed prison staff to obtain additional treatment for Thomas in the Emergency Department should the bleeding restart. It is undisputed that corrections staff did not comply with those instructions. Indeed, it is undisputed that Dr. Mohiuddin was never informed that the bleeding had started again. EMTALA does not require doctors to follow patients after they are discharged with stabilized conditions to ensure they comply with instructions in the discharge paperwork and/or seek additional treatment in the event their symptoms resurface. Dr. Mohiuddin's decisions to discharge Thomas shortly after the insertion of the Rhino Rocket and to trust prison staff to comply with his discharge instructions may have amounted to negligence, but as previously noted, the EMTALA is not a federal negligence statute.

Because the undisputed evidence shows that Thomas was stabilized at the time Dr. Mohiuddin ordered that he be discharged, the EMTALA was not violated. *See Thomas v. Christ Hosp. and Med. Ctr.*, 328 F.3d 890, 893 (7th Cir. 2003) (holding that a patient will be considered stabilized if "it is determined that the patient has reached the point where his/her continued care, including diagnostic workup and/or treatment, could be reasonably performed as an outpatient or later as an inpatient, provided the patient is given a plan for appropriate follow-up care with the discharge instructions"). For these reasons, Waupun Memorial Hospital is entitled to summary judgment on the EMTALA claim.

---

[2] Nurse Paredes disputes that Thomas' nose started bleeding again before he left the hospital. She states under penalty of perjury that she does not recall seeing Thomas' nose bleeding after Dr. Mohiuddin inserted the Rhino Rocket nor does she recall anyone telling her that Thomas' nose had started bleeding. Further, she states that if she had known his nose had started bleeding again, she would have noted it in his ER chart and would have notified Dr. Mohiuddin, particularly because Dr. Mohiuddin had specifically instructed that Thomas be returned to the Emergency Department for additional treatment should the bleeding restart.

12

## 2. Dr. Mohiuddin and Nurse Paredes are not "state actors" and therefore cannot be sued under 42 U.S.C. §1983.

To state a claim under §1983, a plaintiff must establish that a person acting under the color of state law deprived him of a right secured by the Constitution or a federal law. *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 822 (7th Cir. 2009). While in most cases a state actor is an officer or employee of the state, on some occasions, the acts of a private party are fairly attributable to the state because the party has acted in concert with state actors. *Id.* at 823 (citations omitted). In the context of medical care, the Seventh Circuit has instructed courts to focus on the function of the medical care provider in their fulfillment of the state's obligation to provide health care to incarcerated persons. *Id.* at 825; *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) ("Whether a medical provider is a state actor is a functional inquiry[.]"). A court must "focus[] on the relationship between the state, the medical provider, and the prisoner. *Shields*, 746 F.3d at 797. "[M]edical providers who have 'only an incidental or transitory relationship' with the penal system generally are not considered state actors." *Id.* at 797-98.

The appellate court's holding in *Shields v. Illinois Department of Corrections* is instructive. There, the prison's health care provider selected a specialist for a referral from a list of specialists that they maintained. The prisoner was examined one time by specialists who recommended physical therapy for a shoulder injury. The specialists did not require a follow-up visit, nor did they indicate what further treatment may be needed. The Seventh Circuit explained that the specialists "had only an incidental and transitory relationship with the penal system." *Shields*, 746 F.3d at 798. The appellate court noted that, after recommending physical therapy, the specialists "had nothing more to do with the patient." *Id.* The inmate was not scheduled for a follow-up appointment, nor did the specialists retain responsibility for his course of treatment. And while the prison healthcare provider had arranged for the treatment and while the specialists had treated

13

other inmates before, there was no evidence that *the specialists* had a contract with the healthcare provider or the prison, that their practice focused on treating inmates, or even that they regularly treated inmates as part of their practices. The Seventh Circuit therefore concluded that the specialists' relationship with both the prisoner and the prison healthcare provider was only incidental and transitory and too attenuated to support the conclusion that they were acting under the color of state law. *Id.*

Here, Thomas' institution arranged for him to be transported to the Emergency Department at Waupun Memorial Hospital. Dr. Mohiuddin and Nurse Paredes just happened to be working that night. Neither of them has ever been employed by the state of Wisconsin or by the Wisconsin Department of Corrections (DOC) nor has either personally entered into any contract with the state or the DOC to provide medical care to prisoners. Dr. Mohiuddin explains that, under the EMTALA, he must screen and treat *any* patient that presents to the Emergency Department without regard to the patient's incarceration status. Dkt. No. 105 at ¶¶10-16. Further, at no time has Dr. Mohiuddin or Nurse Paredes managed the continuing care of any inmate in the DOC's custody, including Thomas. And as was the case with Thomas, once a prisoner is assessed and treated in the Emergency Department, the prisoner is returned to the custody and care of his medical providers at the prison. *Id.* at ¶¶17-18. With regard to Thomas specifically, after Dr. Mohiuddin concluded his condition was stable and discharged him, he did not order a follow-up appointment or expect to have anything more to do with him. Rather, he specifically ordered that Thomas consult with his ENT and neurosurgeon for further care and to determine his future course of treatment. Based on the undisputed facts, Dr. Mohiuddin and Nurse Paredes' contact with Thomas over the course of a few hours was simply too incidental and transitory to support the conclusion that they were acting under the color of state law.

Thomas highlights a contract requiring the hospital to provide medical services to prisoners, "including inpatient, outpatient and emergency services." Dkt. No. 120-2 at 199. But the presence of a contract, while relevant, is not dispositive. *See Rodriguez*, 577 F.3d at 825 (noting that the court should not rely on the particular contractual arrangement that the physician has with the state but rather should focus on the function of the physician). Further, the contract that Thomas highlights clarifies that "the purpose of this Contract is to provide DOC with access to the *specialized* Medical Services" of the hospital and its providers. *Id.* (emphasis added). Dr. Mohiuddin and Nurse Paredes explain that no "specialized" service was provided to Thomas. Instead, Thomas received the care that any patient (prisoner or not) who presents for care at the Emergency Department would receive as required under the EMTALA. Indeed, the Seventh Circuit has considered the very circumstances at issue in this case when it determined that providers who rendered care at a hospital's emergency department were *not* state actors:

> For instance, an Emergency Medical System that has a pre-existing obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons. . . . Rather, it has undertaken to provide a specific service, emergency medical care, to *all* who need those services. The fact that it does not, and cannot, discriminate against incarcerated individuals does not mean that it has agreed to step into the shoes of the state and assume the state's responsibility toward these persons.

*Rodriguez*, 577 F.3d at 827-28.

In short, Dr. Mohiuddin and Nurse Paredes' relationship both to the DOC and to Thomas were too indirect and too attenuated for them to be liable as the state for the provision of medical services. The undisputed facts show that they did not replace the state but "merely assist[ed] the state in the provision of health care." *Rodriguez*, 577 F.3d at 828. Accordingly, the Court cannot reasonably infer that they acted under the color of state law, so Thomas fails to state a claim against them under §1983 and summary judgment must be granted in their favor.

15

3. **The Court declines to exercise supplemental jurisdiction over Thomas' state law claims.**

Because all claims over which the Court has original jurisdiction are being dismissed, the Court declines to exercise supplemental jurisdiction over Thomas' state law claims. *See* 28 U.S.C. §1367(c)(3). The Court will therefore dismiss his state law claims without prejudice. Given that Thomas was allowed to proceed against the Fund only with respect to his state law claims, the Court will deny the Fund's summary judgment motion as moot.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Medical Defendants' motion for summary judgment (Dkt. No. 100) is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to 28 U.S.C. §1367(c)(3), the Court declines to exercise supplemental jurisdiction over Thomas' state law claims, so those claims are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that the Defendant Fund's motion for summary judgment (Dkt. No. 107) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**, and the Clerk of Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on July 21, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.